Mr. Adcock. Distinguished judges of the Fifth Circuit, the appellant comes to the court today requesting a reversal of many errors that we point out in the trial court in the Northern District of Mississippi. The subject case involves use of the criminal process to collect a civil debt. It reminds me of the old harsh British laws, which if a debtor owed money and didn't pay at a certain time, they put him in prison. It was called debtor's prisons. The liberty of the debtor was held as security for payment of the debt. In this case, the appellee has admitted . . . I'll get right down to the issue on that because I understand it. If I'm wrong, you can tell me. But the question is standing, right? That's what the district court held, that you did not have standing to raise the issue? Yes, Your Honor, on the statute, on the constitutionality. So, I mean, if . . . Why don't you address that specifically? You do or do not have standing to raise the issue? Where's the standing to raise it? Where's your injury? The district judge was incorrect in that there was no DA fee paid. That's the reason it was his grounds for not allowing Mr. Harvey to have standing and the reason he struck that cause of action. If . . . and, of course, the district judge struck our whole response to the motion for summary judgment. Where is your injury? My injury is the deposition of Nick Geraci, the sole employee of the worthless check division in Orleans Parish DA's office. He testified by deposition that a deal was reached between Mr. Cannizzaro and Mr. Harvey's attorney on February the 8th, 2013, where Harvey agreed to pay $1.5 million to Jazz to repay the debt. He also agreed to pay $300,000 to the district attorney. Now, there's a dispute in the record, though, at least in the briefing, I should say, not in the record, but whether that was paid or not. Are you maintaining that Mr. Harvey paid that or a portion of that? I guess I'm going back to what Judge Jolly just asked. Where is the injury? What did he pay to the DA's office, not to Jazz? Both Mr. Harvey and Mr. Geraci testified that in their deposition that Harvey was paying, currently at that time, paying $25,000 to Jazz, $2,000 a month to the DA. I mean, this is outside the record, but, I mean, we have canceled checks. I remember briefcase and statements of Harvey's account. But, I mean, the point the district court made, I think, was that you paid no more than the market itself. Is that correct? No. That was, and I appreciate you saying that, Judge, calling that to my attention. Harvey was mistaken in his deposition that he was going to pay $1.5 million and the casino was going to pay the DA fee of $300,000. Geraci, I asked Geraci about that in his deposition, and he said that offer was rejected by Jazz. And the deal was, as agreed on, $1.5 to the casino, $300,000 to the DA. So he actually paid $300,000 to the DA? He paid the last, the reason this isn't in the record is October of 2018 is when he made the final payment to the DA. He paid the casino off in five years with payments of $25,000. At that time, he had paid $120,000 to the DA, and he paid October of 2018, he paid $50,000 more. So his total is $170,000. But that wasn't in the record because it occurred after the deposition's briefing. I want to go call the Court's attention to the record. Can we take notice of it? Yes, sir, because Geraci testified that the deal was $300,000 to pay the DA, and at the time he said he was collecting on the 15th day of each month monthly payments of $2,000 from Mr. Harvey. So the record does show that your client was paying substantially over the amount of the market in the form of some shares? Absolutely. And that's confirmed by Harvey's deposition in paying $2,000 a month. He was currently paying $2,000 a month and in the deposition of Geraci. I want to make a point and be very clear to this Court that the dispute in September of 2011, Mr. Harvey's just leading up to that, September of 10, Mr. Harvey's wife died of 32 years. He began gambling, probably to the excess, and resulted in a substantial debt to the casinos. Let me clear me up on this. What is your remedy if the statute, collection statute, is unconstitutional?  And how do the casinos address your injury? Right, sir. We have three causes of action, really four, that survive because there was no proof of probable cause at the time. The casino actually entered an agreement to prosecute on September the 8th, and that's after Mr. Harvey had gone to meet with them after the stock payment, all that. This claim is against only one of the casinos here in New Orleans? It is against Jazz, which is one in New Orleans, and the casino and the owner of the one in New Orleans, Caesars Entertainment Operating Corporation, which manages and owns the Paris New Orleans. Two of the defendants you've sued are liable under this claim of yours? Right, right. But what would you have them do? We have damages. Your complaint was about, I mean, you opened with an argument about liberty and debtors' prisons. What do the casinos have to do with that? We have three causes of action, abusive process, malicious prosecution, and false arrest, all of which are based on the NALPROS agreement that was entered. There's a presumption under Louisiana law and Mississippi law that it's favorable to the plaintiff here on terms of the accused. But getting to proximate, I mean— You haven't sued the DA, right? You've only sued private parties here? Right. The DA, I'll get to— Isn't the DA who prosecutes? Pardon me? Isn't it the DA, not the casinos, who prosecute? No, sir. The casino entered, and this is in documentary evidence in the record, an agreement to prosecute on September 8th, where they assigned all their rights to the DA's office and requested prosecution under the worthless check. The worthless check statute requires two elements. And the instigator was supposed to be, under Mississippi and Louisiana law, they're required to prudently look at each element. The first element is intent to defraud. The second element is knowledge of insufficient funds in my account and inability to borrow. The casino presidents in the record admitted they had no proof of Harvey's intent to defraud him. The Geraci and the casinos never checked his bank account, never checked his borrowing ability. So they didn't have proof of either element. They contend that they sent a DA letter to Mr. Harvey on September 2nd. I understand that the district court never addressed this issue that you're talking about now because it dismissed it for lack of jurisdiction. Am I correct about that? No, sir. They—the court struck the—they never mentioned the elements of the criminal statute we're dealing with here. That goes to the merits. Maybe I'm misunderstanding this, but I thought the district court dismissed this on the ground of standing as far as your attack on the constitutionality of the Louisiana collection statute. Well, we're saying that they lack probable cause, and so we have these tort causes of action, abuse of process, malicious prosecution, and false arrest arising out of prosecuting. And they instigated it. They agreed and requested the DA to prosecute. After being told, before they entered the agreement, after the markers were dropped, two different representatives of Harris New Orleans called the DA's office and talked with lawyers. The lawyers told them, and we've got this documented. The stock payment does not—is not a violation of the worthless check statute 1471. It signals a—the marker, which is the check, never passes through the account. Number two, it's a dispute between the creditor and the debtor or the payer or the payee. It's—this is a fraud statute. You have to prove fraud. And they had no fraud. Did the district court say anything about this argument that you're making now? No, sir. The district court found just in a one-liner that because Mr. Harvey stopped payment, that was—that rendered the check worthless. And that—that was—that was probable cause to prosecute, which is—which is a misstatement. You've got other issues or not, but your time is running out if you have other issues. Yes, sir. One other thing. Can we talk about the motion to compel a settlement? Yes, sir. You are running out of time, and I want to make sure you are able to address that. You conclude that the parties have agreed to a settlement? Yes, sir. This—this—a bunch of seizures—all seizures entities sued except the two we're suing now, Jazz and— You have a signed settlement agreement? That's what I'm missing here. No, we have—we hired an attorney in Chicago to make a claim in the bankruptcy court that was in the—the bankruptcy lawyer for Jazz represented only debtors. He said he represented only debtors. We were—we were only settling with debtors. Your time is coming down. Do you have a signed settlement agreement? Primarily the judgment that Robinson Property Group has against Harvey. That's what we said. How was the settlement memorialized? Was it put on the record orally? It was—it was agreed to by a string of e-mails. A string of e-mails. Okay. And that represents an agreement which you wanted to have enforced in the court. And as I understand it, your appeal is that the court decided it didn't have jurisdiction. Yes. To enforce the settlement. Okay. Let me—before your time runs out, we may come back to that, but with regard to the pre-judgment interest, it seems like the district judge entitled the March entry as a final judgment. What authority is there that we should disregard the district court's designation of the final judgment and move that date up to the date of the summary judgment? What is your best case that says we can do that? There's—on the compound interest, there is—the appellees were pursuing attorney's fee claim, which is an unliquidated claim. Pre-judgment interest cannot be awarded for an unliquidated claim. Okay. That's good. The other thing with regard to the Robinson claim for fees and costs against your client, what is your best argument that Robinson should not have—I mean, you obviously want that part of the judgment affirmed. Absolutely. Absolutely. What's your best argument that they're not entitled, that Robinson isn't entitled to recovery? They didn't follow the judge's instructions to allocate their—only the contract was with—Harvey's contract was with Robinson Property Group only. And the judge told them, get your—separate your fees, and they never did. They claimed—they claimed their whole fees, the whole expenses for the whole lot of the defendants the whole time. So one other thing that when—when Harvey's case was—a warrant was issued, no attorney in the DA office of the Williams Parish looked at it. Geraci, a guy that's a non-attorney, didn't go to college, railroaded the whole thing, got the warrant issued, served Harvey in Madison County, Mississippi. You've saved five minutes for rebuttal. Thank you. Mr. Watkins. May it please the Court, Your Honors, I'm Paul Watkins here today on behalf of Caesars Entertainment Operating Group, Robinson Property Group, the cross-appellant in this case, and Jazz Casino Company, which owns and operates the Harrah's New Orleans. I'd like to start by trying to address a few of the points that the Court brought up in its questioning, and if we have time at the end, I'd like to circle back around to the issues surrounding Robinson's cross-appeal on attorney fees. The issue of standing that Your Honors were asking about a minute ago relates solely to Mr. Harvey's claim that the Louisiana worthless check statutes are unconstitutional to the extent they allow the district attorney to collect a fee for each worthless check that they process and collect. That's what the statute says. The questions about probable cause and malicious prosecution are separate tort law claims. The standing relates to the federal claim. So the district court did hold that Mr. Harvey didn't have standing to pursue that federal claim, the constitutionality claim, but he addressed the state law claims on their merits. Now, with respect to Mr. Harvey's new argument that he actually was made to pay the full amount of the district attorney fee, or now a reduced amount, $170,000, I think Mr. Aycock said, $170,000 is certainly not in the record. And it's important to point out here Mr. Harvey never argued before his rebuttal brief in this Court that he had to pay anything above the $1.5 million. Mr. Harvey at his own deposition testified, it's 1.5 and I quit. I'm making payments to the DA. That's the face amount of the marker. Yes, sir. $1.5 million was the undisputed amount that Mr. Harvey paid. Is there a difference between a check being worthless because it has insufficient funds or no funds to support it, or in the circumstances I understand here where the check is funded but a stop payment is requested? We have cited authority in our brief, Your Honor, Louisiana state law that says stop payment checks can fall under the worthless check statute. I guess the technical answer to your question is yes, there is a difference because the facts surrounding that circumstance are going to be different. But I think the Louisiana Supreme Court has held that you can issue a check that you later stop payment on with the intent to defraud. Do they distinguish between fraud as in I'm passing a check that I know is worthless at the time I pass it and fraud as in I incurred a debt and I paid with a check that was sufficiently funded, however now I'm going to prevent that check from being honored? Your Honor, I don't recall if there's a discussion of that in that particular case that we've cited, but I would submit that no matter how the check becomes dishonored, you can have fraudulent intent at any point in the process. And the statute would apply regardless? That's correct, Your Honor. Addressing again the standing issue, the court should not accept Mr. Harvey's outside-the-record representations that he had to pay $170,000, an amount that never appeared in the record, because he never contended that. But, Your Honor, at the end of the day, the casino never received any amount of district attorney fee. The casino received at best the $1.5 million face value that Mr. Harvey admits and admitted that he owed it. So even if Mr. Harvey was correct that the statute that allows the DA to collect a fee when it collects and processes a worthless check is unconstitutional, it's not unconstitutional with respect to a private entity that didn't benefit from it in any way. He can't collect that fee from us because we didn't collect it. The DA is not a party. The State is not a party. It's not an injury that's redressable in this lawsuit. You turned the debt over to them, didn't you? How did it get into the hands of the district attorney in the first place? An employee of the Jazz Casino Company filled out a worthless check affidavit, Your Honor, that listed the specific markers that Mr. Harvey had signed and signed it over to them. Mr. Adcock mentioned a minute ago the agreement to prosecute. There's a form at the bottom of the affidavit that says, I understand that the district attorney has the discretion whether or not to prosecute and how to go forward with this and that they are now responsible for collecting the payment. I also want to point out, Your Honor, that separate and apart from the standing issue, whether Mr. Harvey can redress his injury through the casino, which he can't, Mr. Harvey, neither in rebuttal nor standing before this court, has rebutted Jazz Casino Company's arguments as to the substantive unconstitutionality of the statute. This statute does not allow the district attorney to mandate that anyone pay a fee. It doesn't give them contempt authority. It doesn't say anywhere that the fee is actually set in stone as a matter of law. It says the district attorney may collect a fee when it processes and collects on a worthless check. Now, if the person who is accused of passing a worthless check contends that they don't owe the face value of the check, they don't have to pay the district attorney anything. They can proceed with the criminal process, which is exactly what Mr. Harvey did for a period of time. He litigated in criminal court up until the point that he entered into the restitution agreement with the district attorney's office. The cases that Mr. Harvey cites in his primary brief, this is the Toomey and Ward line of cases from the Supreme Court, all deal with public officials who have adjudicative authority. These are mayor's courts, justices of the peace. There's an optometry board that has the ability to enter sanctions and to debar people from the practice of optometry. This statute simply doesn't give the district attorneys in Louisiana that authority. Now, Mr. Harvey has argued that it may be the case that after a conviction, a court can come back and assess a DA fee, but if a court is assessing a fee that's payable to a district attorney, a separate entity, that doesn't raise an impermissible risk of bias, as Ward and Toomey said that the mayor's courts in that case do. So even if the district court was incorrect, that Mr. Harvey didn't have standing to challenge this lawsuit, and even if Mr. Harvey's injury was redressable from the defendants that he's chosen to proceed against, the statute is not substantively unconstitutional because nothing in that statute gives the prosecutors adjudicative authority to make a decision and assess a fee. I'm trying to understand this claim here. I mean, against the casinos, the casino gave to the district attorney a worthless check to collect, and then the plaintiff is suing the casino for relief on that claim, for turning it over to the district attorney? Yes, sir, Your Honor. My understanding is that the claims to the constitutionality of the district attorney fee and state law claims both have to do with the fact that the casino turned over the worthless checks to the district attorney's office. But what if we held that the statute were unconstitutional? Where is his relief coming from that other than the declaration that it is unconstitutional? He has none, Your Honor. The casino can offer him no relief. He's not claiming a monetary judgment or monetary claim against the district attorney of the State of Louisiana, is he, of Orleans Parish? That's correct, Your Honor. I'll clarify and say that during the course of the litigation, I believe we moved either to dismiss or for clarification for the failure to join a necessary party because he challenged both Louisiana and Mississippi statutes. Mr. Adcock subsequently notified the AGs of both of those states. The Attorney General of Mississippi entered an appearance. The Attorney General of Louisiana did not. So he's suing the casino because the check that he gave them was he stopped payment on it, and then the casino turned it over to the district attorney, and he is suing the casino for turning his worthless check claim over to the district attorney? Yes, sir, Your Honor. And as I understand, I'm sorry. So he is saying that the casino committed a tort whenever it filed an affidavit with the district attorney to collect his check. Yes, sir. That's my understanding of the claim. And to that point, Your Honor, with respect to the state law claims that are directly brought against the casino, Mr. Harvey has argued again. And what damages is he claiming for that tort of turning it over to the district attorney? In the district court, with respect to the state law tort claims, Your Honor, Mr. Harvey claimed reputational damages. I think there was a claim for damage related to the sale of a business that he had. All related to their filing an affidavit to collect the check he gave them that he placed an insufficient place they do not pay on. That's correct, Your Honor. That's correct, Your Honor. Mr. Adcock mentioned a minute ago their argument that there was no probable cause for the casino to turn that over to the district attorney's office. And there's a 10-day presumption in Louisiana law, like there is under Mississippi law and many other states, that if you give a person notice that a check they wrote you has been returned and give them an opportunity to pay, they can pay and make good on it. But the statute also says that if they don't pay, you're entitled to presume that they intended to defraud you in the first place. Mr. Harvey has argued in his rebuttal brief to this court for the first time that the 10-day letter period under Louisiana law was not satisfied here. I don't think that holds because the statute specifically says that the 10-day starts when the letter gets put in the mail, not when you receive it. And if the letter is dated, as Mr. Harvey says, September 2nd, and the DA didn't seek an arrest warrant until September 23rd, that's much longer than 10 days. But it's important to also remember that Mr. Harvey wrote the check and stopped payment on the check in July. He had written it in April. So he certainly knew at the time that the dispute arose that he had written the check and that it had not gone through because he had stopped it from going through. Does his claim also include the argument that there is a difference between a check for insufficient funds and stop payment, as Judge Englehart was earlier talking about? He has made that argument, Your Honor. As I indicated to Judge Englehart, though, Louisiana law is clear that a stop payment check can also fall under the worthless check law. But he does make that argument. He does make that argument. That's correct, Your Honor. I would also point out I didn't mention these excerpts in our brief, Your Honor, because Mr. Harvey had not made this argument in his primary brief. But the casino certainly had probable cause to turn the check over to the DA's office. Again, he had known Mr. Harvey was well aware about the status of the check. And when we asked Mr. Harvey why he stopped payment on the check, he said he objected to the casino dropping it right on time and not giving him a few days to pay. He also said he told an employee of the casino that it would screw up his credit or ruin his credit. These are quotes from pages 2860 through 2862 of the record that were depo excerpts in support of our motion for summary judgment. So if he's telling employees of the casino, please don't deposit the markers, it could screw up my credit, they certainly had reason to believe that he knew there wasn't sufficient money in the account at some point to cover the check. And even if the 10-day presumption had not arisen, that would be probable cause enough to have turned it over to whoever they needed to turn it over to. The more fundamental point with the malicious prosecution claim, though, Your Honor, is this prosecution did not terminate in Mr. Harvey's favor. You have to show that you won, that you prevailed on the underlying criminal case in order to proceed on a malprice claim. And in this case, the record is clear, Mr. Harvey entered into a restitution agreement. Now, in rebuttal, and this is again an argument he made for the first time on rebuttal, he says that the no price that the Orleans Parish D.A. entered was actually related to the merits of the case because they didn't think there was any reason that the charges should go forward. There's no evidence of that in the record. The D.A. never said that. The criminal court docket didn't reflect that. Pages 3195 and 3196 of the record show the docket entry the criminal court entered. It says defendants signed a waiver of time limitations. State and defense entered into a restitution agreement. Mr. Harvey signed that waiver of time limitations on 3195 that waived the statute of limitations on the offense and said I understand that if I miss a payment, the prosecution can be reinstituted against me. All right. Now, how many defendants are included in this claim with respect to the stop payment check? My understanding, Your Honor, there were many more defendants. I know there were a bunch of them. Below, my understanding is the appeal has come up against Jazz Casino Company, which is the entity that owned and operated the Harrah's New Orleans, and Caesar's Entertainment Operating Company, which is, without getting too deeply into the record, an entity that is way up the corporate chain and may have employed some employees that had knowledge of some of these facts or talked with them. All of these other defendants that were dismissed are not on appeal now. That's correct, Your Honor. Below, Mr. Harvey conceded at the summary judgment stage that 12 of the 17 defendants had no place in the litigation. There was no claim against them. And he later said in discussing the attorney fee application that there were four primary defendants, but he only brought up claims against two. If I could take a moment, Your Honors, I want to go back and talk about the – I'm sorry, Your Honor – and briefly address Robinson's request for attorney fees. Your Honors, the district court abused its discretion when it denied Robinson's application for attorney fees after it had awarded summary judgment in favor of Robinson in its entirety, and it might be unfair or inequitable for the court to issue an award of attorney fees in this case. The underlying facts are undisputed. There was an attorney fee agreement. It applied. Mr. Harvey owed $850,000 pursuant to it. But isn't the issue with the attorney's fees that it included a lot of fees and costs that were not recoverable under whatever agreement there was? Didn't the district judge ask you to parse that out into those that were recoverable and those that either were not or arguably were not? Yes, Your Honor. The district court did ultimately hold that Robinson was not going to get an attorney fee award because it had sought fees that were attributable to other defendants and not solely Robinson. So as I mentioned a minute ago, there were 17 named defendants in this case. Mr. Harvey's pleadings pled a widespread conspiracy among all of them. It didn't separate out any claims against any particular defendants, so they all had a common interest throughout the litigation. One law firm represented all of those defendants throughout the entire litigation, and we have undisputed affidavit proof in the record in support of our fee application that from the very start of the litigation, the attorney bills went to Caesars Entertainment Operating, the central processing entity. They were paid there, and then they were internally allocated to Robinson. Now, Robinson at this time was the only defendant that had to pursue a counterclaim. It was the only one that actually had to litigate to get its money back. The other two casino entities had repayment agreements that came through the district attorney's office. Now, the district court criticized the way that the fees were allocated, but it's undisputed that they were in fact allocated that way. Robinson paid all of the attorney fees in this matter. Because we were defending numerous defendants, 17 different defendants, we didn't perform one task 17 different times, Your Honor. We performed— Was your point that if Robinson had been the only litigant, the fees would have been basically the same? I think that's correct, Your Honor. Now, it's true that there were some tasks that were performed that benefited other defendants to the exclusion of Robinson. And were those segregated? Yes, Your Honor. By the time we got our—and the district court pointed some of those to us out in its first two attorney fees rulings. We went back, manually reviewed those billings, and removed about $70,000 of attorney fees that were arguably unrelated to Robinson. But at the end of the day, our ask of about $414,000 broke down. The fees weren't partitioned in a way that was particular to defendants. They just weren't. But of the $414,000 or so that we saw in fees, only $22,000 or so related to work that was performed related to Robinson only. And that would have been related to Robinson's counterclaim. Robinson had a separate summary judgment motion with respect to its counterclaim. So there were some of those claims, but it was a very small amount of the total. The district court did correctly hold that Robinson was entitled to an award of fees also for the fees incurred in defending against Mr. Harvey's claims, because without defending those, it couldn't have gotten the judgment. It ultimately did. Tell me about the enforcement of the settlement issue. It seems as though the district court held that it did not have jurisdiction to consider enforcement of this settlement. Are you in agreement with that, or is your position that jurisdiction or no, there was no settlement to be enforced? I think I'd be in agreement with both of them, with the caveat, Your Honor, that I think the district court could certainly decline to exercise its jurisdiction. The district court looked at the state of the record, realized that it had dismissed all of the claims three and a half years prior, and determined that at that point there was no live issue before the court. Had it entered a final appealable judgment by that time, or were those just rulings in the record that disposed of claims that needed to be put into a judgment? Your Honor, my recollection is that at the time the final judgment was entered, Mr. Adcock's motion to enforce the settlement was pending at that time. I think he ruled on that motion after the final judgment was entered. We also do maintain that there was no settlement agreement reached. There is no signed settlement. Mr. Adcock references in his brief there's a separate state court action that's ongoing now related to the enforceability of that settlement, and I just point out that in his briefs Mr. Harvey doesn't argue to this court the merits of the actual settlement agreement and what the relative facts were. He just asks for a clarification on the jurisdictional issue, and we would submit that the clarification isn't necessary because there's nothing that requires the district court to exercise jurisdiction over that settlement. I think that's going to wrap my time. Thank you. We have your argument. Mr. Adcock, you have reserved five minutes for rebuttal. Thank you. Very quickly, addressing the attorney's fee issue, the casino first applied for fees and expenses of $570,000 a year. The judge denied it. $531,000 the next time and then $502,000. They state in their brief to this court that their calculations of fees, attorney's fees incurred only for Robinson Property Group, which is most telling, is $21,000. And $570,000, $531,000 is a far cry from $21,000. This is basically a collection action. What do you make of his point, though, that they approached the litigation essentially as if, whether it was one party or 17 parties, it was the same legal work because it was all one single unitary legal theory? No. We sued so many defendants, the casino wouldn't tell us who the parties were that were involved with Harris New Orleans in referring the issues to the DA. So we sued. I mean, if you look at their structure, it's a pyramid of LLCs. I understand you sued a lot of entities. My point is what's your response to their argument that had you only sued Robinson, it would have been the exact same legal work other than that $70,000? One deposition of Robinson Property Group, Scott Barber, the casino manager, that's the only deposition that was taken related to the Robinson Property Group. Did you have legal theories that were not applicable to Robinson that they're nevertheless taking fees for? Well, he negotiated a payment agreement after the markers were dropped, Scott Barber did, and so his testimony went to the collection of the markers by Robinson and to the payment agreement, which the casino contended Mr. Harvey breached by gambling at another casino. So I want to go to the, but yes, we do contend that the overwhelming majority of the fees were incurred for defenses of the tort claims. Could you talk about the settlement agreement real quick? I asked you earlier and I don't think I got an answer. Is there, do you submit there's a signed settlement agreement somewhere in the record? No, it's an exchange of e-mails. Okay. So I'm looking at what I think are the e-mails. What I see is from a lawyer at Kirkland & Ellis, we will accept the offer, we'll draft up a settlement agreement. Is that the e-mail exchange you're talking about? Yes. But the attorney came back. There was an agreement as to a price, $825,000, for settlement of the, with the debtor corporations, which did not include the current appellees. Right. And then the settlement agreement, they came back and said we can't settle for the, with any of the, we've got to settle dismissing the whole federal court case in Mississippi. But so you're focused on the word we will accept the offer? Yes. Okay. But what do you make of the very next sentence, we'll draft up a settlement agreement? They were in, the parties were in agreement and they were going to draft a settlement agreement. But the seizures came back and said, look, this agreement is not for anything less than settling with the people we, they said they didn't represent, which are the current appellees. Well, why is it the best way to read this is essentially accepting the offer in principle, but obviously the e-mail specifically says we need to draft an agreement to make sure we're reaching agreement on terms. The amount of settlement was $825,000. Each party would release each other. We're going to do a mutual release. I think that's the basis of our argument. There was a settlement. That's the e-mail that you're talking about. There's nothing else on the record? There's an exchange of e-mails over the course of days, yes. That's the e-mail thread. Okay. One thing that I want to make very crystal clear here is that it seems that the Court's concern over the, just the act of affidavit to the DA and an agreement to prosecute is not any big deal. Geraci, the guy that had Harvey arrested with the warrant, said the DA's office absolutely has to have this agreement and has to have this affidavit to prosecute. This instigates the whole process. They would not have prosecuted Mr. Harvey but for the affidavit and agreement to prosecute. Thank you. The case is submitted. We'll call up.